# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH GOMEZ, III, | Case No. 1:17-cv-01077-SKO |
| Plaintiff, | |
| v. | ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | |
| Defendant. | (Doc. 1) |

On August 10, 2017, Plaintiff Joseph Gomez, III ("Plaintiff") filed a complaint under 42 U.S.C. § 1383(c) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (the "Act"). (Doc. 1.) Plaintiff filed his opening brief on April 27, 2018 (Doc. 15), and Defendant filed her opposition on May 29, 2018 (Doc. 16). The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

## I. BACKGROUND

On July 19, 2013, Plaintiff filed an application for SSI payments, alleging he became

---
[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 7, 8.)

1  disabled on March 2, 2012, due to herniated and bulging discs in his lower back, numbness in both
2  of his legs, and nerve damage on his left side. (Administrative Record ("AR") 17, 72, 85, 186–94,
3  205.) Plaintiff was born on February 19, 1980, and was 33 years old on the application date. (AR
4  28, 72, 85, 201, 229, 248.) He completed the eleventh grade. (AR 206.) Plaintiff has past work
5  experience as a pump installer and a driver. (AR 28, 42–43, 82, 96, 207, 213–16.)

**A.  Relevant Medical Evidence[2]**

    **1.  Sierra Pacific Orthopaedic & Spine Center**

In March 2012, Plaintiff fell off a ladder at work and injured his low back in the L4 disc area. (AR 43, 370.) An MRI of Plaintiff's lumbar spine performed April 4, 2012, showed mild hypolordosis; degenerative disk disease; a 4-mm left posterolateral disk protrusion at L3-4 with mild spinal stenosis, impingement of the left L4 nerve root at the left neural canal, and fissure of anulus fibrosus; and a 7-mm posterior disk protrusion, with a 20-mm x 16-mm x 7-mm extruded disk, moderate to severe spinal stenosis, impingement of the L5 nerve roots at the lateral recesses, and fissure of anulus fibrosus. (AR 435.)

Plaintiff presented to Henry Aryan, M.D., on May 9, 2012, for a consultation. (AR 400–403.) He complained of severe pain in his back and both legs, as well as bladder dysfunction. (AR 400.) On examination, Plaintiff had "3/5" weakness for bilateral dorsiflexion, and "4/5" weakness for bilateral plantar flexion and knee extension. (AR 401.) The remaining muscle groups tested "5/5" in the lower extremities, with no atrophy noted. (AR 401.) Dr. Aryan found Plaintiff had diminished sensation in his legs, feet, and saddle area, and his straight-leg raising test was positive bilaterally.[3]  (AR 401.)

On June 26, 2012, Plaintiff underwent one-level spinal fusion surgery at L4-5 performed by Dr. Aryan. (AR 315, 325, 334, 345–49.) On October 10, 2012, Plaintiff complained of back pain as well as pain in the left lower extremity, numbness, and tingling. (AR 318.) He ambulated

---

[2] As Plaintiff's assertion of error is limited to the ALJ's finding that Plaintiff did not meet or equal one of listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 1.04A ("the Listings"), only evidence relevant to that argument is set forth below.

[3] A straight-leg raising test is performed during a physical examination to determine whether a patient with low back pain has an underlying herniated disc. The straight leg raising test is positive if the patient experiences pain down the back of the leg when the leg is raised. *See Soria v. Colvin*, No. 1:12-cv-00424-SKO, 2013 WL 1820088, at *1 n.4 (E.D. Cal. Apr. 30, 2013).

2

slowly and was "very tender" to palpation over the entire midline lumbar spine. (AR 319.) Plaintiff had "5/5" motor strength in the lower extremities and a negative straight-leg raising test. (AR 319.) His sensation was "slightly decreased" to light touch in the left L5 dermatome. (AR 319.)

Plaintiff complained of increasing back pain and left leg pain on November 2, 2012, with tingling and numbness in his right medial calf and "significant weakness." (AR 315.) On November 20, 2012, Plaintiff underwent an electromyogram (EMG) study on his bilateral lower extremities, which was normal. (AR 295.) A nerve conduction study performed that same day was "compatible with a mild peripheral neuropathic process with a probable superimposed or concomitant left S1 radiculopathy[4]." (AR 296.)

An MRI of Plaintiff's lumbar spine performed December 7, 2012, showed mild hypolordosis; mild degenerative disk disease; postsurgical changes at the L4 and L5 levels; a 4 mm left posterolateral disk protrusion at L3-4 with mild spinal stenosis, fissure of anulus fibrosus, suspected mild impingement of the left L3 nerve root at the left neural canal, and no significant interval change; and fibrosis or inflammatory tissue at L4-5 surrounding the thecal sac, causing impingement of the left L5 nerve root at the left lateral recess and possible impingement of the right L5 nerve root at the right lateral recess. (AR 421.)

On May 28, 2013, a CT scan of Plaintiff's lumbar spine was performed, which showed, among other things postsurgical changes from laminectomies and hardware placement involving the L4 and L5 vertebrae, particularly that the tip of the left L5 screw had traversed the vertebral body and into the soft tissues, the probable result of loosening. (AR 409–10.)

**2.  Ali Najafi, M.D.**

On October 1, 2013, Ali Najafi, M.D. performed a revision surgery on Plaintiff, which entailed a reinstrumentation at L4-5 and decompression and fusion instrumentation at L3-4. (AR 535–46.)

At a follow-up appointment on November 1, 2013, Plaintiff reported "significant improvement" of his leg pain and continued mild lower back pain. (AR 548.) On physical

---

[4] Radiculopathy is "disease of the nerve roots." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1595 (31st ed. 2007) (hereinafter "DORLAND'S").

examination, Plaintiff had moderate discomfort with palpation of the paraspinous muscles and lower extremity strength of "5/5". (AR 548.) Dr. Najafi advised Plaintiff to "increase his activities as tolerated and continue his current pain regimen." (AR 549.)

On January 17, 2014, Plaintiff reported his low back pain, lower extremity pain, and paresthesia[5] had "improved significantly" and he had been decreasing his pain medication over the past few weeks. (AR 748.) On examination, his incision was well-healed and he had "5/5" motor strength throughout his bilateral lower extremities. (AR 748.) Dr. Najafi noted Plaintiff was "doing well" and advised him to "increase his activities as tolerated." (AR 749.)

An x-ray of Plaintiff's lumbar spine performed March 17, 2014, revealed no evidence for loosening or infection involving the hardware. (AR 747.) The x-ray also showed hypolordosis, "[m]inimal compression deformities" involving T12 and L1 vertebral bodies, mild degenerative disc and joint disease, and "[m]inimal grade I retrolisthesis." (AR 747.) Plaintiff complained of mild lower back pain on March 18, 2014, yet noted "significant improvement" of his lower extremity pain and numbness. (AR 745.) Dr. Najafi noted Plaintiff was taking "minimal pain medications." (AR 745.) On examination, Plaintiff had moderate discomfort with palpation of the paraspinous muscles and normal gait. (AR 745.) Dr. Najafi again advised Plaintiff to increase his activity level. (AR 746.)

### 3. Eric Sorensen, M.D.

On January 14, 2013, Plaintiff saw Dr. Sorensen for a follow-up appointment to address his back pain. (AR 491.) Plaintiff complained of "a lot of pain to the lumbar area and radiculopathy to the left side." (AR 491.) He ambulated on his own with a "slightly titled [sic] hunched over gait." (AR 491.) On examination, Dr. Sorensen noted Plaintiff's surgical sounds had healed well, but there was "myofascial pain to palpation to the surgical site across the paraspinal muscles of the lumbar spine from the L2-L5 area." (AR 491.) Plaintiff's range of motion was limited, with pain on flexion and lateral rotation. (AR 491.) Dr. Sorensen found no weakness to Plaintiff's lower extremity and muscle strength of "5/5". (AR 491.)

---

[5] Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." DORLAND'S at 1404.

4

Plaintiff presented to Dr. Sorensen on October 22, 2013, complaining of severe back pain following his October 1, 2013, revision surgery. (AR 728.) He was observed to ambulate on his own with a "hunched over gait[,] slow and cautious." (AR 728.) On examination, Dr. Sorensen noted Plaintiff's surgical wound was healing well. (AR 728.) Plaintiff had edema, pain to palpation, and difficulties with flexion and extension of his spine due to pain and discomfort. (AR 728.) He had slight to normal sensation and symmetrical motor strength at "5/5." (AR 728.) Dr. Sorensen noted Plaintiff experienced back pain with dorsiflexion of both feet. (AR 728.)

Plaintiff reported to Dr. Sorensen on November 11, 2013, that his pain was "somewhat improved" and numbness and tingling to his lower extremities was also improved. (AR 732.) He had "significant grinding" to his back. (AR 732.) Dr. Sorensen observed Plaintiff had limited range of motion of his spine and pain with extension and lateral rotation. (AR 732.) Plaintiff's motor strength was "5/5". (AR 732.)

On December 2, 2013, Plaintiff complained of continued radiating pain and numbness to his left lower extremity, although not as severe as before surgery. (AR 733.) Plaintiff ambulated with a normal gait. (AR 733.) On examination, Plaintiff had generalized muscle spasms to his lumbar spine but no spinal process pain to palpation or percussion. (AR 733.) His range of motion of his spine, flexion and extension, and lateral rotation caused pain and discomfort. (AR 733.) Plaintiff had no obvious muscle atrophy and normal sensation. (AR 733.) His motor strength was symmetrical to the distal extremities at "5/5". (AR 733.) Because Plaintiff had low back pain when the left lower extremity was raised, a slightly positive straight-leg raising test was suggested. (AR 733.)

An EMG study was performed on April 4, 2014, which was "[m]ildly abnormal," showing "mild swelling of the various nerves of the lower extremity suggesting peripheral neuropathy[6]." (AR 754–55.) On May 23, 2014, Plaintiff underwent an x-ray of his lumbar spine. (AR 917.) The x-ray showed "[m]inimal compression deformities" involving the L1 and L2 vertebral bodies, "[m]ild grade I retrolisthesis at the L2-3 level in all three positions," and mild degenerative disk

---

[6] Peripheral neuropathy is "a functional disturbance or pathological change in the peripheral nervous system" of "several peripheral nerves simultaneously." DORLAND'S at 1287–88, 1513.

and joint disease. (AR 917.) On September 8, 2014, Plaintiff reported that his back pain was "improving somewhat" and that it was adequately controlled with medication. (AR 904.) On examination, Plaintiff had myofascial pain to palpation and pain and discomfort with extension and rotation. (AR 904.) He had full range of motion in both upper and lower extremities, with normal strength in his upper extremities and normal sensation in his lower extremities. (AR 905.) Plaintiff had a positive straight-leg raising test on the left. (AR 905.)

Plaintiff complained to Dr. Sorensen on December 15, 2014, that his low back pain was worsening with the cold weather. (AR 892.) He reported improvement of symptoms with physical therapy, describing it as "helpful." (AR 892.) Dr. Sorensen noted Plaintiff was "limping slightly" with his left leg. (AR 892.) He had pain with extension and lateral rotation and a positive straight-leg raising test on the left. (AR 892.) Dr. Sorensen found had normal sensation, no obvious motor atrophy, and motor strength normal at "5/5". (AR 893.) On January 15, 2015, Plaintiff complained of continued back pain and left groin pain. (AR 889.) He continued to have a positive left straight-leg raising test, myofascial pain to palpation, and pain with extension and flexion. (AR 890.) Plaintiff's strength in his lower extremities was "5/5" with no obvious muscle atrophy and normal sensation. (AR 890.)

On February 16, 2015, Plaintiff presented to Dr. Sorensen complaining of a "grinding sensation" to his lumbar spine and radiation of pain toward his left lower extremity, with no weakness or muscle atrophy. (AR 886.) On examination, Plaintiff had limited range of motion with flexion; extension caused pain and discomfort. (AR 887.) He also had pain in his lumbar spine with lateral rotation. (AR 887.) Dr. Sorensen found that Plaintiff "[c]ontinues to have" positive straight-leg raising test results on the left side to approximately 90 degrees and an antalgic, limping gait with the left leg. (AR 887.) Plaintiff had normal sensation and normal strength at "5/5". (AR 887.)

On April 8, 2015, Plaintiff returned for a follow up on his chronic lower back pain. (AR 875, 883.) Dr. Sorensen noted Plaintiff's pain seemed to be stable with medication. (AR 875, 883.) On examination, Plaintiff had limited range of motion and pain with extension and lateral rotation. (AR 876, 884.) Dr. Sorensen found Plaintiff had full range of motion, normal strength,

6

and normal sensation in his upper extremities. (AR 876, 884.) Plaintiff had a positive straight-leg raising test on his left side, with no edema and unremarkable sensation. (AR 876, 884.) Plaintiff's gait was noted as "slightly antalgic." (AR 876, 884.) On examination on April 14, 2015, Plaintiff had normal sensation and strength in both upper and lower extremities, with a positive straight-leg raising test on the left. (AR 882.) Plaintiff was observed to have an "antalgic gait, limping with the left leg." (AR 882.)

Plaintiff continued to complain of pain to his back and radiating pain to his lower extremities on April 28, 2015. (AR 872.) Dr. Sorensen noted Plaintiff had minimal pain to palpation and normal sensation to his lower extremities, but a positive straight-leg raising test on the left side. (AR 873.) An MRI of Plaintiff's lumbar spine performed September 19, 2015, showed normal postoperative fusions, with "no canal stenosis or apparent neural impingement," and "[s]evere bilateral L5-S1 facet arthropathy/hypertrophy." (AR 770.) In November 2015, Plaintiff reported his pain level at a "3/10" and "at least a 70% improvement in pain" with medication. (AR 923.)

On March 8, 2016, Dr. Sorensen reported Plaintiff complained of low back pain and bilateral leg pain. (AR 923.) Plaintiff also reported that he is continuing to have a "significant amount" of pain in his coccyx and buttocks and numbness in his toes bilaterally. (AR 925.) Dr. Sorensen found Plaintiff had limited range of motion, joint pain, muscle pain, and muscle weakness, and assessed him with "[i]ntervertebral disc disorder with radiculopathy, neuralgia, neuritis, chronic pain syndrome, [and] failed back surgery." (AR 925.) Plaintiff was referred to Dr. Najafi. (AR 925.)

### 4. William E. von Kaenel, M.D.

On December 1, 2015, pain management specialist Dr. von Kaenel evaluated Plaintiff for his back and lower extremity pain. (AR 778–83.) Plaintiff complained of "constant" pain in a "stabbing and spasm sensation to his mid lumbar region, sacral sulcus, and to the gluteal region, posterior thigh, calf, and to the inguinal region on the left, anterior thigh with burning, pins and needles, shooting, and numbness to the posterior thigh, calf, anterior crural region, and to his toe." (AR 779.) Upon examination, Plaintiff's muscle strength was "5-" with respect to his hip

7

extension, toe dorsiflexion, and foot eversion. (AR 780.) From this, Dr. von Kaenel concluded Plaintiff had "radiculopathy on the left at L5 and S1." (AR 782.) Dr. von Kaenel also noted that Plaintiff's "surgical levels appear unremarkable with no nerve compression." (AR 782.) He further noted that Plaintiff's MRI "notes that there was severe bilateral facet hypertrophy but does not opine as to whether there may be foraminal narrowing on the left due to this facet hypertrophy." (AR 782.)

On January 4, 2016, Dr. von Kaenel administered to Plaintiff a transforaminal epidural injection on the left at L5 and S1. (AR 771–77.) Plaintiff reported no improvement with the injection. (AR 771.)

### 5. Tachi Medical Center

On October 19, 2015, Plaintiff presented to Tachi Medical Center for a physical examination and complaints of hip pain. (AR 801.) He reported improved back pain. (AR 801.) On examination, Plaintiff had full range of motion in his extremities without limitation, intact strength and sensation in all extremities, and intact motor function. (AR 802.)

Plaintiff presented on January 19, 2016 to follow up on a sleep study. (AR 790.) Plaintiff again had full range of motion in his extremities without limitation, intact strength and sensation in all extremities, and intact motor function. (AR 790.)

**B.    Administrative Proceedings**

The Commissioner denied Plaintiff's applications for benefits initially on December 19. 2013, and again on reconsideration on March 21, 2014. (AR 104–08, 113–17.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 119–25.) At a hearing on March 29, 2016, Plaintiff appeared with counsel and testified before an ALJ as to his alleged disabling conditions. (AR 41–59.)

A Vocational Expert ("VE") testified at the hearing that Plaintiff had past work as a pump installer, Dictionary of Operational Titles (DOT) code 630.684-018, which was heavy exertional work, with a specific vocational preparation (SVP)[7] of 5; and as a driver, DOT code 902.683-010,

---

[7] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in

medium exertional work, with a SVP of 2. (AR 60.) The ALJ asked the VE to consider a person of Plaintiff's age, education, and with his past jobs. (AR 60–61.) The VE was also to assume this person is limited to sedentary work. (AR 61.) The VE testified that such a person could not perform Plaintiff's past relevant work, but could perform sedentary, unskilled (SVP 2) work as an order clerk, DOT code 209.567-14; an assembler, DOT code 734.687-018; and a sorter, DOT code 521.687-086. (AR 61.)

Plaintiff's counsel then asked the VE to consider another, second hypothetical person of Plaintiff's age, education, and with his past jobs, who could occasionally lift and/or carry five pounds or less, rarely lift 10 pounds, and never lift 15 pounds or more. (AR 61.) Such person could sit, stand, and/or walk approximately two hours out of an eight-hour day, would need unscheduled breaks of 5 to 10 minutes about every 45 minutes to one hour, and could never grasp, twist, perform fine manipulation, or reach with their upper extremities. (AR 62.) The person would be off task more than 30% of the day and would be absent from work five days or more. (AR 62.) The VE testified that that there would be no work that such an individual could perform. (AR 71.)

### C.     The ALJ's Decision

In a decision dated April 13, 2016, the ALJ found that Plaintiff was not disabled, as defined by the Act. (AR 17–29.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920(a). (AR 19–29.) The ALJ decided that Plaintiff had not engaged in substantial gainful activity since July 19, 2013, the application date (Step One). (AR 14.) At Step Two, the ALJ found Plaintiff's following impairments to be severe: minimal degenerative disc disease of the lumbar spine, status post-revision lumbar fusion surgery; and severe hypertrophy and arthropathy at L5-S1 and mild degenerative changes in the left hip. (AR 19.) The ALJ determined, at Step Three, that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 1.02 ("Listing 1.02") or 1.04 ("Listing 1.04"). (AR 21.) Specifically, the ALJ found that Plaintiff did not meet Listing 1.02 "because [Plaintiff] is able to ambulate effectively, there is no gross deformity, and no

---

the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id*.

evidence of loss of strength in the lower extremities," and that he did not meet Listing 1.04 because "there is no evidence of compression post-revision surgery, and [Plaintiff] is able to ambulate effectively." (AR 21.)

The ALJ then assessed Plaintiff's residual functional capacity ("RFC")[8] and applied the RFC assessment at Steps Four and Five. *See* 20 C.F.R. § 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ determined that Plaintiff retained the RFC "to perform the full range of sedentary work as defined in 20 CFR [§] 416.967(a)." (AR 22.) Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" he rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record." (AR 23.) The ALJ found that, based on the RFC assessment, Plaintiff was unable to perform his past relevant work of pump installer and driver (Step Four), but retained the capacity to perform jobs that exist in significant numbers in national economy, specifically the jobs of order clerk, assembler, and net sorter (Step Five). (AR 28–29.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on June 14, 2017. (AR 1–8.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 416.1481.

## II. LEGAL STANDARD

### A. Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

---

[8] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996). The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility [for disability benefits], the Commissioner" is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." *Id.* § 423(d)(2)(B). For purposes of this determination, "a 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The Ninth Circuit provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing [his] past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 416.920(a) (providing the "five-step sequential evaluation process"). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

11

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue her past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.     Scope of Review**

"This court may set aside the Commissioner's denial of disability insurance benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence is defined as being more than a mere scintilla, but less than a preponderance." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098). "Put another way, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund*, 253 F.3d at 1156 ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record

that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

### III. DISCUSSION

Plaintiff sole allegation of error is that the ALJ failed to find that Plaintiff's impairments met or equaled Listing 1.04A. (*See* Doc. 15 at 4–9.)

### A. Legal Standard

At the Third Step of the sequential disability evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or equal any of the impairments listed in the Listings. *Tackett*, 180 F.3d at 1098. The Listings set forth by the Commissioner "define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citations omitted) (emphasis in original). At Step Three of the sequential evaluation, Plaintiff bears the burden of demonstrating that his impairment meets or equals a Listing. *Burch*, 400 F.3d at 683.

For a claimant's impairment to meet a listing, it must, for a period of 12 continuous months, "meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530 (citations omitted) (emphasis in original); *see also Key v. Heckler*, 754 F.2d 1545, 1550 (9th Cir. 1985); 20 C.F.R. § 416.925(d) ("To meet the requirements of a listing, [the claimant] must have a medically determinable impairment(s) that satisfies all of the criteria in the listing."); 20 C.F.R. pt. 404, subpt. P, app'x. 1 (stating the 12-month rule). Alternatively, a claimant can qualify for benefits by showing that his unlisted impairment, or combination of impairments, is "equivalent" to a listed impairment by presenting "medical findings equal in severity to *all* the criteria for the one most similar impairment." *Sullivan*, 493 U.S. at 531 (citations omitted); *see also Marcia v. Sullivan*, 900 F.2d 172, 175–76 (9th Cir. 1990).

**B. The ALJ Properly Determined at Step Three that Plaintiff Did Not Meet or Equal Listing 1.04A.**

**1. The ALJ's Finding That Plaintiff Could Ambulate Effectively Was Not Limited to Listing 1.04A.**

Plaintiff first contends that the ALJ erred in requiring evidence of the "inability to ambulate effectively" to meet or medically equal Listing 1.04A, which pertains to disorders of the spine. (*See* Doc. 15 at 5–6.) Plaintiff characterization of the ALJ's finding, however, is unduly narrow and inaccurate. The finding that Plaintiff did not meet or medically equal the Listings because the evidence showed he was "able ambulate effectively" was not limited to Listing *1.04A*. Instead, the ALJ found that Plaintiff did not meet or equal Listing *1.04* because he could ambulate effectively. (*See* AR 21.) Listing 1.04 requires that Plaintiff have a spinal disorder "resulting in compromise of a nerve root . . . or the spinal cord[,]" along with one of its three subparts:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, subpt. P, app'x 1, § 1.04. While Plaintiff is correct that Listing 1.04A does not require evidence of an inability to ambulate effectively, Listing 1.04C does. *See id.* Because the ALJ did not limit his finding to Listing 1.04A, he did not err in finding that Plaintiff did not meet or medically equal Listing 1.04 because the evidence demonstrated Plaintiff was able to ambulate effectively, a requirement for Listing 1.04C.

14

## 2. The ALJ Did Not Err in Finding that Plaintiff Did Not Meet or Equal Listing 1.04A.

Plaintiff next contends that the record includes evidence that he meets or equals Listings 1.04A, despite the ALJ's finding that there was "no evidence of [nerve] compression post-revision surgery." (AR 21.) As set forth above, Listing 1.04A requires evidence of nerve root compression characterized by (1) "neuro-anatomic distribution of pain," (2) "limitation of motion of the spine," (3) "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss," and, in the case of lower back impairments, which is the case here, (4) "positive straight-leg raising tests (both sitting and supine)." 20 C.F.R. Pt. 404, subpt. P, app. 1, § 1.04A.

Although there is evidence in the medical record of lumbar radiculopathy (*see* AR 24–25, 296, 782, 925), it fails to support Plaintiff's contention that he met or equaled "all" of the requirements for Listing 1.04A for at least 12 continuous months during the relevant period. *See Zebley*, 493 U.S. at 530, 531. Although Plaintiff maintains that the evidence demonstrates "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss," the record provides only sporadic evidence of the existence of these deficits and, in many instances, the evidence belies Plaintiff's argument entirely. While records show that Plaintiff had positive straight-leg raising tests on his left side in December 2013 (AR 733), September 2014 (AR 905), December 2014 (AR 892), January 2015 (AR 890), February 2015 (887), and April 2015 (AR 873, 882), those same records show that Plaintiff also had normal sensation in his lower extremities during those time periods. (AR 873, 882, 887, 890, 893, 905.) An MRI of Plaintiff's lumbar spine performed September 19, 2015, showed normal postoperative fusions, with "no canal stenosis or apparent neural impingement." (AR 770.) Normal findings with respect to Plaintiff's lower extremity sensation continued in October 2015, when, as the ALJ observed, Plaintiff reported that his back pain had improved. (AR 25, 802.) As the ALJ further observed, Plaintiff continued to have normal sensation in all extremities in January 2016. (AR 25, 790.)

Similarly, the medical evidence demonstrates that Plaintiff had normal or intact muscle strength in January 2013 (AR 491), October 2013 (AR 728), November 2013 (AR 732), December

15

2013 (AR 733), January 2014 (AR 748), December 2014 (AR 893), January 2015 (AR 890), February 2015 (AR 887) and October 2015 (AR 802). While an April 2014 EMG study was "[m]ildly abnormal," showing "mild swelling of the various nerves of the lower extremity suggesting peripheral neuropathy" (AR 754–55), Plaintiff was found to exhibit no evidence of muscle atrophy in December 2014 (AR 893), January 2015 (AR 890), and February 2015 (AR 886). Consistent with these findings, Plaintiff reported improvement in his symptoms in November 2013 (AR 548 ("significant improvement" of leg pain), 732 (numbness and tingling to Plaintiff's lower extremities improved)), January 2014 (AR 748 (low back pain, lower extremity pain, and paresthesia "improved significantly")), March 2014 (AR 745 ("significant improvement" of Plaintiff's lower extremity pain and numbness)), September 2014 (AR 904 (back pain "improving somewhat")), and November 2015 (AR 923 (reporting a pain level at a "3/10" with "at least a 70% improvement in pain" with medication)). Lastly, in December 2015 Dr. von Kaenel found Plaintiff's muscle strength was weakened in some areas (AR 780), but by January 2016 Plaintiff had, as the ALJ noted, intact strength and motor function in all extremities. (AR 790.)

Thus, despite evidence in the record demonstrating that Plaintiff had a "[m]ildly abnormal" EMG study, some positive straight-leg raising tests on one side, and a diagnosis of radiculopathy, he has failed to show that, absent evidence of "nerve root compression characterized by . . . motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss" for at least 12 continuous months during the relevant period, his impairment met Listing 1.04A. Moreover, although he mentions it in passing in his Opening Brief, Plaintiff does not present a theory of how his impairments *medically equaled* Listing 1.04A. *See Kennedy v. Colvin*, 738 F.3d 1172, 1178 (9th Cir. 2013) ("An ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence.") (quoting *Burch*, 400 F.3d at 683); *Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001) (affirming where the ALJ did not discuss the claimant's impairments or compare them to any listing, but where the claimant "offered no theory" and "pointed to no evidence" supporting a finding that he met or equaled a listed impairment). *See also Bennett v. Colvin*, 609 Fed. Appx. 522 (9th Cir. 2015) ("[T]he ALJ was not required to explain

16

why Bennett's impairments do not equal Listing 1.04, because Bennett did not present evidence in an effort to establish medical equivalence"). Accordingly, the ALJ's determination that Plaintiff lacked evidence of nerve root compression following his revision fusion surgery was not in error, and Plaintiff's contention that he met or medically equaled Listing 1.04A is unavailing. *See Cattano v. Berryhill*, 686 F. App'x 408, 410 (9th Cir. 2017) (finding that the plaintiff did not meet or equal all the requirements for Listing 1.04 because he was "unable to point to evidence that he has suffered motor loss and sensory or reflex loss . . . for twelve continuous months." (citing 20 C.F.R. Part 404, Subpart P, App. 1, § 1.04A)).

### 3. The ALJ's Duty to Develop Record Was Not Triggered.

Finally, Plaintiff's contention that the ALJ failed in his duty to develop the record by not utilizing a medical expert is equally without merit. (*See* Doc. 15 at 6–7.) The ALJ's "duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001); *see also Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005). Here, Plaintiff alleges that his counsel at the hearing "provided evidence to show" that a medical expert "was needed," citing the hearing transcript. (Doc. 15 at 7.) The hearing transcript contains no such "evidence," however. Instead, it shows that Plaintiff's administrative counsel asserted that Plaintiff met or equaled Listing 1.04A, to which the ALJ responded with a discussion of the medical evidence and a request that counsel identify medical records to support his argument, so that he could take the argument under consideration:

> ATTY: Your Honor, to reiterate that, we would submit that [Plaintiff] meets or equals Section 1.04A of the listing and –
>
> ALJ: Can you directly – I know we just talked about the RFC questionnaire from yes 19F, but is there a particular provision of 1.04 which [INAUDIBLE]? I didn't see that in your Brief and I didn't really see necessarily evidence that would support it.
>
> ATTY: Well, Your Honor, the MRI of 9/19/15 showed severe bilateral L5/S1 arthropthy [sic] and hypertrophy. The EMG –
>
> ALJ: Right.
>
> ATTY: -- of 4/4/14 showed -- was mildly abnormal suggesting peripheral neuropathy.

17

> ALJ: Right. If I could pause you there, I mean mild abnormality. I mean that doesn't equal 1.04A, B or C.
>
> ATTY: I don't –
>
> ALJ: I mean if they're -- I mean if there's, I mean if there's something else, I mean I didn't see, you know, post the revision surgery of October 2013, I didn't see evidence of nerve root compression. I didn't see spinal arachnoiditis. I didn't see lumbar spinal stenosis in there that such -- in fact, to such a degree that he could no longer effectively ambulate. I mean if there is that evidence in there, please -- I mean now is the opportunity to go ahead and point it out to me.
>
> ATTY: Well, Your Honor, I don't believe the listing prescribes the degree of peripheral neuropathy. The EMG did show peripheral neuropathy. He does show sensory deficits in Dr. Sharma's examination. Left ankle jerk was decreased which shows reflex deficiencies.
>
> ALJ: Okay. So you're -- so basically again 1.04A, is that what I interpret that you're making, the argument that you're making?
>
> ATTY: Yes, Your Honor
>
> ALJ: Okay. Well, we'll go ahead and take a look at that. Anything else, Counsel?
>
> ATTY: No, sir.

(AR 62–64.) While Plaintiff obviously disagrees with the ALJ's assessment of the medical evidence, he fails to articulate how the above-cited exchange at the hearing demonstrates the existence of an ambiguity or inadequacy of the record to allow for proper evaluation of the evidence. To the contrary, the Court had found that there is ample evidence in the record to support the ALJ's finding that Plaintiff does not met or medical equal Listing 1.04A.[9] (*See* Section III.B.2, *supra*.) Because the existing evidence is neither ambiguous nor insufficient, the ALJ's duty to more fully develop the record was not triggered.

In sum, the evidence provides substantial support for the ALJ's conclusion that Plaintiff's

---

[9] Two sentences in Plaintiff's Opening Brief appear to suggest the contention that the ALJ erred in finding that Plaintiff's "evidence of mildly diminished sensation" was not "directly attributable to his back condition" (AR 21) because the ALJ is "not qualified to interpret raw medical data in functional terms." (Doc. 15 at 8.) It is well-settled that an ALJ may not substitute her own medical judgment for that of a physician. *See Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("an ALJ cannot arbitrarily substitute his own judgment for competent medical evidence") (internal quotations and citation omitted); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor."). Here, although it is not clear to what "evidence of mildly diminished sensation" the ALJ is referring—and Plaintiff offers no discussion apart from the two sentences he devotes in his Opening Brief, such error, if any, is harmless because the medical record demonstrates a lack of evidence of "nerve root compression characterized by . . . motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss" for at least 12 continuous months during the relevant period, as required by Listing 1.04A. *See Molina*, 674 F.3d at 1121–22; *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004)).

spinal impairment, alone or in combination, did not meet or equal the requirements of Listing 1.04A, and Plaintiff has not met his burden of showing otherwise. *See Sullivan*, 493 U.S. at 530; *Burch*, 400 F.3d at 683. Accordingly, the Court finds that the ALJ did not err at Step Three.

### IV. CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated: **July 23, 2018**  /s/ *Sheila K. Oberto*
UNITED STATES MAGISTRATE JUDGE